By the Court.*—Westbrook, J.
A motion is *79 made in behalf of the prisoner, who was, by the verdict of a jury rendered on Saturday last (February 26), convicted of the crime of perjury, to arrest the judgment. The crime was alleged to have been committed in verifying a bill presented to the board of supervisors of the county of Albany, in November, 1880, for his services as an undertaker in burying the bodies of several persons, in his bill specified, and in preparing such bodies for interment. The several objections will be stated and considered in the order in which they were presented.
First. It is urged that the affidavit was not made ' before an officer authorized to administer an oath for such a purpose. It purports to be verified before Jeremiah Kieley, a commissioner of deeds in and for the city and county of Albany, and it is argued that it should have been made before the chairman of the board of supervisors.
This objection is founded upon section 63, page 881 of volume 1 of the Revised Statutes (6 ed.). That section prevents the auditing “by any board of town auditors, or supervisors or superintendent of the poor,” of any account unless the same “ shall be made out in items, and accompanied with an affidavit attached to and to be filed with such account, made by the person presenting or claiming the same, that the items of such account are correct, and that the disbursements and services charged therein have been in fact made or rendered, or necessary to be made and rendered at that session of the board, and stating that no part thereof has been paid or satisfied.” The conclusion of that section is a separate sentence, and is as follows : “And the chairman of such board, or either of said superintendents, is hereby authorized to administer any oath required under this section.”'
We cannot regard the power conferred by the section upon the chairman of a board of supervisors as *80 exclusive. The verification of the bill by an affidavit in a prescribed form is required, but it is not declared before whom such verification must be made. The power conferred by the closing sentence, to administer oaths, is not bestowed in such language as to indicate any intention to repeal other statutory provisions. Section 61 (same page, &c.) expressly provides : “The chairman of any committee appointed by a board of supervisors is hereby authorized to administer an oath to any person presenting an account or claim before such committee to be audited, as to services rendered, and the correctness of such claim.” By section 39, page 446, of volume 3 of the Revised Statutes (6 ed.), it is declared : “Whenever any oath or affidavit is or may be required or authorized by law, in any cause, matter or proceeding (except oaths to jurors and witnesses in the trial of a cause, oaths of office, and such other oaths as are required by law to be taken before particular officers), the same may be taken before any judge of any court of record, any . . . commissioner of deeds,” &c. Such plain and explicit provisions as these cannot be repealed by the conferring, of authority to take an oath upon some other officer.
Second. It is urged that the indictment shows the nature of the services claimed to h,ave been rendered by the accused, and that they were of a kind for which, even if in fact rendered, the board of supervisors could make no compensation, and, therefore, that the oath was immaterial.
If it were true that the board of supervisors could not allow the bill, the conclusion that, the verification, though willfully false, would not make the party so verifying guilty of perjury, does not follow. Is it true that if a corruptly false affidavit is presented to a body or a tribunal for action to be taken thereupon, and such body or tribunal refuses to act because it rightfully concludes it is powerless to afford the relief *81 asked, that the party who is willfully false in his evidence cannot be punished? If, upon the trial of an ' issue before a court, a witness swears falsely, with a corrupt intent, to a matter material to the issue made by the pleadings, is he to escape justice because the court rightly held that, conceding the truth of the issue as made by the pleading of the party giving the evidence, he has still failed to make out a cause of action or a defense ?
The answering of these questions in the affirmative involves a construction of the materiality of evidence, in order to make a party guilty of a crime, which is unwarranted in the law. Whenever a claim is presented to a court or tribunal for adjudication, two questions are at once involved: First, are the facts, on which the claim is based, as claimed by the party? Second, conceding the truth of the allegations, do they entitle him to relief ? It would be unsound to say that evidence tending to prove the allegations made would be immaterial, because, conceding their truth, there could be no recovery. If it could be said that the evidence was not material for the reason just stated, then in any case where evidence is given of a fact which, if true, would tend to establish the issue made by the party, the individual who testified to such isolated fact could escape a conviction of perjury though his evidence was willfully false, because other evidence in the cause abundantly established the truth of the main issue. Clearly, such reasoning would be bad, for the reason that the witness had falsely given material testimony tending to establish a cause of action, even though the main allegation of the complaint was otherwise abundantly established. When a charge of perjury is preferred, and the point is made that the evidence was not material, the test of the materiality is, did it tend to establish the issue upon which it was offered ? and not, was there sufficient other truthful evi *82 deuce to justify the result % nor, assuming the truth of the issue to be as claimed by the party in whose behalf it is given, is the party entitled to the relief demanded ? An objection may be taken to evidence offered, on several different grounds, each one of which may be valid ; and in such a case, it would not be accurate to say that one of such grounds was immaterial, because the ■ others were valid and were sustained. It would certainly be true to state that the ruling would have been the same if the objection had not been made, but it would also be accurate to declare that the objection was material, for it was sound in law. Precisely this reasoning is applicable to the point we are considering. There might have been legal objections to the audit and allowance of the prisoner’s bill, but as, before the bill could even be considered by the board of super- • visors, the law required it to be verified, it cannot be said that the oath was immaterial, because the affidavit was, in fact, material for two reasons: First, to give the supervisors jurisdiction to consider the claim ; and, second, as furnishing some proof of the truth of the allegations upon which the claim was founded.'
. As this motion was made during a term of the court, and our attention is completely occupied with pending business, we have had no time to examine authorities. Our views, however, seem to us to be so clear on principle, that we must overrule the motion to arrest
II. February 28, 1881. Application for certiorari.
An application on behalf of the prisoner was then made to the same judges for a certificate and certiorari to stay judgment on the indictment and conviction until the decision of the supreme court should be had upon the exceptions taken during the trial.
It. W. PeclíliamwAM. JD. Oonway, for the prisoner.
*83 D. Cady Herrick, district attorney, and J. A. Delehanty, assistant district attorney, for the People.
By the Court.*—Westbrook, J.
The prisoner has been tried and convicted by the verdict of a jury of the crime of perjury. The indictment was founded upon an affidavit subscribed by the prisoner, and purporting to have been taken before Jeremiah Kieley, a commissioner of deeds in and for the city and county of Albany, on November 24, 1880, for the purpose of verifying a bill for undertaker’s services and materials, in conformity with section 63 of page 881 of volume 1 of the Revised Statutes (6 ed.). Application is now made in his behalf that sentence and judgment may be delayed for a few days, so that a bill of exceptions may be prepared and settled, to the end that, when so settled and signed, a certificate may be given by the judge who presided upon the trial, or by a justice of the supreme court, as prescribed by section 29, page 1030, volume 3 of the Revised Statutes (6 ed.).
The section to which reference has just been made provides: “ Such bill of exceptions being settled and signed, if the circuit judge who tried the cause, or a justice of the supreme court, shall certify on such bill, that, in his opinion, there is probable cause for the same, or so much doubt as to render it expedient to take the judgment of the' supreme court thereon, such certificate, on being filed with the clerk of the court, shall stay judgment on such indictment until the decision of the supreme court be had upon such exceptions.”
The granting of the certificate throws upon the district attorney the labor of removing the case into the supreme court by a writ of certiorari, and then pressing the case to a decision and conclusion (3 R. S. [6 ed.] 1031, § 33).
*84 The language' of section 29 and the effect of the certificate impress upon us the conviction that the course suggested by the counsel for the prisoner should not be adopted unless a doubt exists in our own mind as to the correctness of some ruling made by us during the progress of the trial. A knowledge that we are not infallible, and that in the hurry of a trial a mistake is liable to occur, has led us, during the few hours which a suspension of business in court has given, to re-examine the point upon which the alleged error is predicated.
That the apparent affidavit was true was scarcely pretended upon the trial. Confessedly, the prisoner claimed for services he had never rendered, and for others which, though rendered, insisting that they had not been paid for, he demanded compensation, when, beyond any doubt or cavil, he had been fully paid. The defense was not placed upon the ground of either the truth of the statement which the prisoner had made, or of any mistake honestly committed; but it was insisted and argued in his behalf that, probably with full knowledge that the account, which he had pretended at least was verified by affidavit, was wrong and false in part, he had caused not a real, but a sham affidavit to be made, in order to secure thereby the sum justly and honestly due to him, from a body which, as was claimed he knew, always cut down charges, without regard to justice, and from whose award there was no appeal.
It is claimed that the court erred in the law governing such a defense, and in its definition of a legal and binding oath. The examination of the point requires a statement of what the court did say to the jury, and as accuracy in such statement is important, it is now given in its very words, as recorded by its official stenographer.
“ Where a party appears before an officer duly *85 authorized to administer oaths, and hands to such officer a declaration in writing, subscribed by him, in which declaration it is stated in substance that the party subscribing the statement verifies the same by his oath, with the intention thereby of having such officer understand that he, the party, does in fact declare to him, the officer, by written and printed words, that he verifies the same by his oath and also with the intent to have the officer subscribe his certificate, that the statement has thus been verified, and the officer believing that the party intends to declare and does declare on oath, by written and printed words, that he verifies the statement, affixes his name to the jurat; and then after such affixing delivers it to the party, who uses it for the purpose of inducing the official action of some body or court authorized to act thereon, then an oath has been in fact administered, although the words of the oath have not been audibly uttered.
“To apply that rule, which perhaps is too general for you to bear in mind in your retirement, the court further charges you, that if O’Reilly delivered the bill and the affidavit to Kieley to have the same certified by Kieley as sworn to before him, intending thereby to declare to said Kieley that by oath he intended to verify, and did verify, the statement subscribed by him, and the officer regarding him as .so declaring on oath, signs the certificate and the jurat fpr the purpose of evidencing the verification, and then delivers it to the party in that form verified, and the party presents it in that'form and shape to the board of supervisors for the purpose of procuring the audit of the bill, then I charge you' that the oath has been duly and lawfully administered.
1 do not think this rule is at all unreasonable.
‘ ‘ For the purpose of making it clear that this is reasonable and proper, let me say a few words more. It will be conceded that if a party goes before a magistrate and declares to him in words, ‘I swear to the *86 affidavit by me subscribed,’ and requests the officer to append to it his certifícate that he lias taken a proper, valid and binding oath, then such party has taken a valid and binding oath, because he has audibly proclaimed in language his intention so to do. Now that which can be proclaimed in spoken, uttered words, may be as well and as forcibly proclaimed by one to another by written and printed words. Suppose, for example, that the person about to take an oath was deaf and dumb ; he could not speak, he could not hear the spoken words of another, but be could read and write, and read writing and printing ; suppose such a person should appear before a magistrate for the purpose of administering an oath, and present to him a written affidavit, duly subscribed, the language of which is to the force and effect that the party has been duly sworn, and by his oath verities the statement, and without uttering a word he points to the language of the affidavit and points to his signature, and then points to the certificate at the left, .for the purpose of thereby indicating to the officer that he thereby authorizes him to certify that he has then been sworn, would any one doubt that would be a valid oath % That the minds of the officer and party had completely met % That there was an intention upon the part of the one to swear and of the other to administer the oath ? And that, if it was then returned by the officer to the party and the party used it, that in the act of using it and giving it to the world as genuine, he was proclaiming the validity of the oath, and that in fact a good and lawful oath had been administered 2
“There can be, it seems to me, no doubt in the case we have supposed. Let us then apply the illustration to this. If we are correct' in- our .supposed case, then we have demonstrated that spoken words are not necessary to a valid oath ; and therefore, if a party who can read and wriLe and also speak goes to an officer with a *87 declaration subscribed by him, which declaration declares that the party has been sworn and does swear to the truth of the statement, and delivers it to the officer for the purpose of having the officer read the declaration and for the further purpose of having him understand that it is upon oath, as such party declares to him, and then asks the officer to subscribe his name to it, because he has sworn to it, is not that a valid and binding oath ? If you analyze the language of the affidavit, if you interpret the meaning of the meeting and all that took place, is there not in fact and in truth as formal and as com-píete an oath as could be administered by spoken words, if that was the intent and design of both the parties % Would it do, gentlemen, for us to proclaim any other doctrine from this court-room than this % Grant that oaths are sometimes carelessly administered, would it do to proclaim to the world that when an oath has been thus carelessly, if you please so to call it, administered, though apparently fair upon the paper, and a party comes into this court-room, presenting it as a valid oath, and asks the action of this court on it, and this court acts upon the faith of it—would it do, when the party is called upon to respond because of its falsity, to permit him to escape upon the ground that there was no oath, because there were no spoken and uttered words, when such oath was administered.”
To the extract just given, in order t.o present with still more sharpness our instructions to the jury, it should be added that, on the request of the counsel for the prisoner, the court expressly charged that if the jury came to the conclusion there was no intent on the part of the prisoner in what he did to swear to his affidavit, then no oath was administered, and their verdict should be one of acquittal.
Whatever doubts may have existed in our mind as to the correctness of a legal proposition formulated during a trial, without much, if any, opportunity for *88 examination and reflection, such doubts, after further thought, are entirely dissipated, and we now feel confident that we have not erred. Very little need be added to the reasoning given in the charge, and we, therefore, will only refer to a few authorities establishing principles on which the charge rests.
Before doing so, however, it is proper to state that we fully agree with the propositions enunciated by the court of appeals in Case v. People (76 N. Y. 242), and with the conclusion there reached. We certainly did not intend to vary in the least from any position therein maintained, not only because the opinions of that court should control our judgment, but also because the entire reasoning of the court, as given by Judge Miller, commends itself most fully to our own convictions. The principle determined in that case is, that there can be no valid oath administered, unless the officer and the affiant are together. The communication must be direct between the magistrate and the party, and no signing of a pretended deposition by an individual, and the conveyance thereof by a third person to an officer, who is in a different room, or perhaps in a different building, for the purpose of affixing to the jurat his official signature, is even an approximation to that which the law requires. Personal contact and communication between the officer who administers the oath and the individual who proposes to take it, are so clearly requisite that no argument is necessary to prove it. When, however, the officer and the would-be affiant are face to face, and when communication is thus clearly directly established between them, thought and intent can be expressed by the one to the other, either in uttered words or in writing, and when conveyed in either way, the one is as clear and as forcible as the other. An audible declaration by the affiant to the officer that he verifies a written statement by his oath, which is accepted by the latter as such, is *89 clearly a valid administration of an oath ; and a written statement, subscribed by the party, and declaring the same thing, made with the intent to verify by oath, and so accepted, understood and acted upon, must be equally valid.
In disposing of the question we are considering, it should be remembered that our statutes require no particular form of an .oath. In People v. Cook (14 Barb. 259), Mason, P. J. (page 310), said: “The com-' mon law doctrine is, that an oath taken in any form to which the affiant assents, and by which he intends to be bound, is, if administered by a competent tribunal, a valid oath (Whart. Am. C. Law, 185 ; 16 Pick. 156; Roscoe Crim. Ev. 130 [ed. 1846]; 6 Carr. & P. 571; Phil. Ev. Cow. & H. Notes, 705, 494). It is said, however, that our statute (2 R. S. 407, § 82), has prescribed the form of ádministering the oath, and that it requires all persons to be sworn, by laying their hands upon and kissing the gospels, unless the witness expresses a different desire.
“ It was held, however, in the case of State v. Whittenhurst (2 Hawks [N. C.] 458), that any form pointed out by the witness is binding, and he may be indicted for perjury upon it; and they add so he may, though he omit to make known his scruples of conscience, and be sworn in the common law form, or any other binding form.
“ They add, by submitting to be sworn in the common form, he makes his election, and is estopped to set up his scruples (Phil. Ev. Cow. & H. Notes, 705). It is also said, in the case of Rex v. Brodribb (6 Carr. & P. 571), that if the oath administered was intended to be administered as binding, and was so' received by the party, it is equally within the statute against perjury, whether the book on which he was sworn was a Testament or not.”
When the same case reached the court of appeals *90 (8 N. Y. 67), the court, per Willard, J. (pages 84, 85), said: “The oath, in this case, though irregularly administered, was a valid oath. If the party taking it makes no objection to the mode of administering it at the time, he is deemed to have assented to the particular form adopted, and is liable to all the consequences of perjury, as if it had been administered in strict conformity to the statute (Phil. Ev. Cow. & H. Notes, 705 ; Id. 1503 ; Cady v. Norton, 14 Pick. 236; Commonwealth v. Buzzell, 16 Id. 153).”
This same doctrine is also contained in Wharton’s Criminal Evidence (8 ed. § 354); in State v. Norris (9 N. H. 96), in which (page 102), the court say: “The term, corporal oath, must be considered as applying to any bodily assent to the oath of a witness in State v. Whittenhurst (2 Hawks [N. C.] 458); and in 2 Brod. & B. 284.
Assuming, then, that the law is, that no particular form is required for a valid administration of an oath, what facts were given to the jury to consider % 1st. The meeting of the prisoner and the officer for the avowed and declared purpose of verifying the account in the manner prescribed by statute. 2d. A declara tion, partly printed and partly written, subscribed by the prisoner, in which he distinctly states he has been “ duly sworn” and on his oath deposes. 3d. The delivery of the declaration, thus subscribed, to the commissioner, who reads it, and thereby is fully informed of what the prisoner states to him by written and printed words. 4th. The acceptance by such commissioner of such written and printed statement as a declaration and oath before him, expressed to the party deposing by the officer’s signature to the jurat, and its delivery by him, in its completed form, to the prisoner. And, 5th. Its. acceptance by the prisoner, as a formal and completed affidavit prescribed by law, proven by its delivery to the board of supervisors for action thereon.
*91 With these facts properly deducible from the evidence, we are clear that no error was committed in the charge, and that the verdict of the jury was amply justified and required by the testimony. We are therefore constrained to refuse the certificate asked for, and to require that the case should be removed into the supreme court in the usual way, by writ of error after judgment. _'
III. March, 1881. Application for stay.
A motion by prisoner’s counsel for a stay of proceedings, with a writ of error, was then made to Judge .Westbrook.
R. W. Peckham and M. D. Conway, for the prisoner.
D. Cady Herrick, district attorney, for the People.
Westbrook, J.
The bill of exceptions prepared on .the part of the prisoner, to review his conviction and sentence for the crime of perjury, has been settled and signed, and application is now made for a writ of error with a stay pending such review. The allowance of the writ is a right which must be accorded to the prisoner (3 R. S. [6 ed.] 1037, § 27), but the stay is not (Id. § 28). This proposition is not disputed by his counsel, but they insist that as the case presents a novel and important legal question, the doctrine, enunciated by Judge Edmonds in the cases of Sullivan and Clark (1 Park. 347), and by Judge Wright in that of Hendrickson (Id. 396), that when the question involved is a grave one, and has never been passed upon by either “ the supreme court in banc or the court of appeals,” a stay ought to be granted, should apply.
' Certainly every human judgment is fallible, and I am profoundly conscious that any conclusion of my own, formed during the pressure of a trial, may be erroneous, and that other judges, who by law review *92 my action, may differ from and reverse me even though my determination was reached after full deliberation. If, however, such reasoning should influence judges in allowing stays in criminal cases, then upon every conviction which had been resisted by able and ingenious counsel, justice would be postponed to the indefinite future, and such confessed uncertainty in the administration of punishment would encourage crime to an extent which would be simply intolerable.
The cjises to which counsel referred were capital, and, as in such, if the execution of judgment be not stayed, errors would be irremediable, good sense and humanity both require that the prisoner should be afforded an opportunity for review, unless the exceptions relied upon are clearly frivolous. This proposition was affirmed by myself in two cases (Hilaire Latrimouille, Henry Moet), and is sound; but such rule should not be applied to all criminal convictions, and especially to the present, because :
First. Its adoption, as has already been stated, would, by destroying all respect for the promptness of justice, stimulate and encourage crime. In People v. Holmes (3 Park. Cr. 507), it was said by Roosevelt, J. : “It will thus be seen that the prisoner has a strict right to the review, but not to the stay. The stay is a matter of discretion, to be exercised only on good cause shown. Of what avail, it may be said, will be review after imprisonment has been suffered ? On the other hand, of what avail, it may be asked, would be criminal trials, if in every case the execution of the sentence were to be delayed by review, at the .mere option of the criminal? Ho man sentenced, either to death or imprisonment, would voluntarily submit. Writs of error would be universal. Promptitude and certainty, so essential to the punishment "of crime, would be entirely defeated, and the whole register of criminal administration would become paralyzed.” *93 The views of the learned judge are not harsh, but eminently sound. Absolute freedom from error is impossible in a human tribunal, and even after conviction and its affirmance in every, appellate court to which it can be taken, we are not absolutely sure that some ruling made upon the trial may not be technically erroneous, and that the judgment of some minds would not so pronounce it. No person can undergo criminal punishment at all unless he has been convicted in a manner known to the law, and when a conviction has been had in the highest court of original criminal jurisdiction in the State, the execution of judgment should not be deferred, unless, in the opinion of the judge to whom the application is made, there is reasonable ground to believe that error has been committed, or unless irremediable injury will be done by such execution, upon a party in regard to whose actual criminality there is reasonable doubt, should the conviction be reversed. Without claiming to be infallible, my own judgment is clear that no error has been committed, and even though some technical cause for reversal should be found, the possibilities of such a result should not defer and suspend punishment; because,
Second. The moral guilt of the prisoner cannot be questioned, and the legal is almost equally clear, for, by the evidence given on the part of the people, it is reasonably certain that an oath in the prescribed statute form was actually administered. His name was subscribed to a statement, partly written and partly printed, which declared that he had been.“duly sworn,” and on such oath verified an account against the county of Albany, and upon that statement there was also- a certificate of an officer authorized to administer oaths, to the. effect that the oath which the prisoner declared he had in fact taken, had been administered by such officer. This deposition, signed *94 by the prisoner, and to which he had also publicly declared he was sworn, by its use to procure the audit and allowance of his claim, was indisputably, beyond doubt or cavil, willfully and corruptly false. The officer, whose name was appended to the jurat, testified that an oath was actually administered; the prisoner also, as has just been stated, so declared over his own signature penned by his own hand; and proof of such subscription of his name by the prisoner to the deposition, and of the signature of the officer to the jurat, without any further or other testimony, made a clear prima facie case, at least, and perhaps a conclusive one (Regina v. Turner, 2 Carr. & K. 732, 735, 736; and also note at end of case), of the lawful administration of an oath. To all this proof, in regard to which there was no dispute, the only defense of the prisoner was an attempt to prove, by some witnesses, who olaimed to have been present when the alleged affidavit was signed, that there had been no formal administration of an oath in audibly uttered and spoken words. The claimed error was the charge of the court upon that defense, which instructed the jury that if the prisoner did, by written and printed words, declare to the magistrate that he was testifying on oath, with the intent so to testify, and if the magistrate’s certificate of the administration of an oath was given with the understanding and belief that such a declaration on oath was made to him for the purpose of having him (the officer) so state by his official certificate, then a lawful oath had been administered. Grant, for the sake of argument, the legal inaccuracy of this charge, it is yet undeniably true that the prisoner presented a false and fabricated bill against the county of Albany, which the positive testimony of the commissioner of deeds and his own subscribed statement proved, was in fact formally verified by an oath legally administered, and that, therefore, he is *95 probably legally, and certainly morally, deserving of punishment. In such a case there should be no stay to enable the prisoner to see if, by some technicality, he may not escape that desert, which every right-minded person will declare to be richly his due.
Third. It is said that the charge enunciated a new rule of law. It would, I think, be more accurate to say, that an old rule of law was applied to a case, in which application no reported adjudication, yet found, has either approved or cordemned it. Certainly the cases cited in a former opinion abundantly establish that forms in oaths are immaterial, and that any form to which a party assents as binding is valid. Mere intention to swear, without any declaration, is certainly ineffectual. But a declaration by a person to an officer authorized to administer oaths audibly uttered, that on his oath he deposes to the truth of certain facts stated to the officer, is, when made and certified to by such officer for use in a proceeding authorized by law, a valid and legal oath; and as a declaration may be made as well by written as by spoken words, it is impossible, it seems to me, to read the document to which the prisoner has appended his name, and the jurat to which the officer has subscribed his official signature, with a knowledge of the conceded fact that. each name was written when the two were in personal contact for the purpose of having the- same verified by the former, without reaching the conclusion that an oath binding in law was in fact administered. The delivery of the written and printed deposition, signed by the prisoner in his own name and by his own hand, to an officer, to be certified as sworn to, was a.declaration—as perfect and complete as though audibly uttered, or written upon a separate paper and subscribed by the prisoner—by the former to the latter that he (the former) regarded himself, to use his very words, as “duly sworn,” and what he assented to, as *96 an oath, is one in fact and in law. The only error in the charge, if any, was in its leaning to the prisoner. The jury was instructed, that if the prisoner did not intend by what he did to take an oath, then he had not been sworn, or, to use other words, if he intended openly to declare he was sworn, whilst mentally he was shamming and lying to the officer, so that he might obtain an official certificate of the lawful administration of an oath in order to defraud the tax-payers of Albany county, then by such mental intent he could escape the legal- consequences of his morally criminal conduct. In my judgment this charge was too unfavorable to the people. That which a party declares to an officer or court is an oath, and so declared for the purpose of inducing official action thereon, should always be so treated, and he should not be allowed to escape justice by the technical plea that he did not intend an oath binding on his own conscience, but only intended to make the court or officer, who accepted it as such, so believe.
The rule of law, as contained in the charge, really gives to a person an opportunity to lie for his own advantage in judicial and other proceedings, without the consequence of punishment, and without the restraining influence of the fear thereof upon the conscience. The jury should, therefore, have been instructed that if the prisoner did declare to the commissioner of deeds by either written, printed or spoken words, or by signs, that on his oath he verified the statement by him subscribed, with the intent to, have the officer so believe, in order to procure the latter’s certificate of the lawful administration of an oath, to be used for a purpose authorized or required by law, and the officer, having thus been induced to believe that the affiant was sworn in a manner binding upon his conscience, gave to him such a certificate, which the affiant used for a purpose in which the law re *97 quired or authorized the use of an affidavit, then they should, for the purposes of that trial, regard the prisoner as having been regularly and legally sworn. In other words, perjury can be committed by willfully false statements, made either by speech or writing or by signs, to an officer or court authorized to administer an oath, if given under what the party declares by words or signs to such court or officer to be a form and manner of its administration binding upon his conscience, and which is so accepted and received, even though the party did not in his heart and conscience intend to take one. The instruction to the jury covered this and more. • It was important for them to find an intent of the prisoner to make the officer believe that the former regarded himself as sworn in a manner obligatory upon his conscience, but it was not important to find that he really regarded himself as under the obligation of an oath. In finding such intent, the written and printed declaration,—subscribed by the prisoner to the jurat upon which he had obtained, by his request personally communicated, the officer’s signature, which was placed thereon in his presence, and he, by silent acquiescence, at least, if not by words, assenting to the truth of the statement signed by the officer that an oath had been administered—was important testimony to be considered. They could not fail to remember that, conceding the absolute truth of all that the prisoner sought to prove on the subject of the administration of an oath, still it was indisputable, upon the testimony of his own witnesses, that he had sought the commissioner to have an affidavit taken for use in a proceeding in which the law required one; that the two being together, the prisoner declared to the commissioner, by a written and printed declaration formally subscribed with his own name by his own hand, that he was making before him a deposition on oath, to which fact he wished the com *98 missioner to certify ; that the commissioner, to whom such declaration was thus made and such wish expressed, accepted the written and printed words so subscribed in lieu of an audible utterance by the prisoner to him of words of similar import, of which acceptance he distinctly informed the prisoner, by appending his official signature to the jurat in the presence of such prisoner ; that the delivery of the subscribed declaration which stated to the officer that the prisoner on oath deposed to its truth, with a request that it shoúld be certified as sworn to, and the giving of such certificate at his request, was in fact, the verification thereof by an oath administered ; and that the document, having thus become, both in form and substance, a completed affidavit, was, used by the prisoner in a legal proceeding in which he knew it would surely be regarded as valid, and that such use by the prisoner thereof was an additional and a clear proclamation by himself that he had in fact been duly and regularly sworn. What inference did these undisputed facts require from the jury, or from any tribunal to which they "were submitted % Can the words, which the affidavit and certificate contain, and which (the handing of the document from the one to the other, as each had subscribed his name to his own statement, clearly shows) were ■ exchanged between the commissioner and the affiant when they were in personal contact, be expunged % It was well said by Davis, J., in Matter of Haller (3 Abb. New Cas. 65), in deciding what was a solicitation of alms under our statute, that “in many instances words are far less effective to accomplish the end than simple acts.’? Bearing this truism in mind, can, it may also be asked, not only the words which the deposition contains, but also all the attending circumstances of the interview between the prisoner and the commissioner, be made meaningless upon the theory advocated by .counsel, *99 that the prisoner intended not to swear but to cheat and deceive the officer, and thereby procure a certificate of the lawful administration of an oath obligatory upon his conscience, in order that without the risk of punishment for perjury he might defraud an already burdened public % Such reasoning does not commend itself either to the judgment or to the conscience. Men’s intents and purposes m-ust, in the administration of oaths for judicial and other legal proceedings, be judged of by what they do and by what they say, either in spoken or written words or signs, and not by their concealed and un uttered mental purposes and reservations. To hold otherwise would be opening wide a door for fraud and wrong to enter.
The discussion of this question ought not to be closed without a statement of the inevitable consequences to individuals and to the public, both in reference to past and future transactions, provided the rule enunciated upon' this trial as governing the administration of an oath, be held to be erroneous. Justice is every day administered upon the faith of papers supposed to be affidavits, because, like the one to which the prisoner appended his name and procured the certificate of the officer, they seem to be regular and valid. Very often parties cause their own affidavits to be presented, and upon them ask for judicial or other action authorized by law. Upon the assumption of the regularity of the oath, which the face of the papers declares, most important questions have been and are continually determined. Titles have been passed, and orders granted, in which affidavits are required to give jurisdiction, involving immense values. All these are liable to be overturned and invalidated, provided that which the prisoner claimed to be the law regulating the administration of an oath is correct. Not only will much of past action be rendered nugatory, bfit in all future administration of justice, the danger of such *100 a result will compel courts and officers to require the personal presence and examination of all parties and persons, whenever proof must be made by affidavit to justify action. In no other way will there be safety in legal procedure or certainty in the administration of justice, for thousands of affidavits in the past have been, and as many more in the future will be taken precisely as the defense claimed that of O’Reilly was. Common practice has sanctioned what is now claimed to be illegal, and an analysis of what must necessarily occur under such circumstances shows, as has been demonstrated, every necessary ingredient of an oath actually taken. Neither reason nor justice requires the adoption of the principle claimed by the defense, and the serious consequences which are sure to follow from any such rule of law, if adopted, should cause a court to hesitate in giving to it its sanction.
For the reasons which we have stated, the application for a stay of proceedings is denied.

 Before Hon. T. R. Westbrook, justice supreme court, and James R. Main and William J. Reid, associate justices.

 Same judges as before.